UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

                                         REPORT & RECOMMENDATION

                 Plaintiff,

                                         04-CR-6080L

        v.

MIGUEL LARA,
GLADYS LARA,
ORLANDO ALFARO (aka "Tito"),
ORSINI L. VAZQUEZ (aka "Pitufo"),
MELVIN RIVERA (aka "Macuco"),
JEANETTE BURGOS (aka "Gigi," aka "Glenda"),
MARISOL ZAPATA,
ALBA LOZANO,
AGUSTIN RAMOS (aka "Flaco"),
RAFAEL LLERA,
ARQUELIO J. TORRES (aka "John"),
WANDA BERMUDEZ,
RACHEL WYAND, and
JERREL LEDATE APPLEBERRY (aka "Dale"),

                 Defendants.

_____


## PRELIMINARY STATEMENT

       By Order of Hon. David G. Larimer, United States District Judge, dated May 11,

2004, all pretrial matters in the above-captioned case have been referred to this Court pursuant to

28 U.S.C. §§ 636(b)(1)(A)-(B).  (Docket # 70).

       Defendants Miguel Lara, Gladys Lara, Orlando Alfaro, Orsini L. Vazquez, Melvin

Rivera, Jeanette Burgos, Marisol Zapata, Alba Lozano, Agustin Ramos, Rafael Llera, Arquelio J.

Torres, Wanda Bermudez, Rachel Wyand and Jerrel Ledate Appleberry are charged in a three-

count indictment.  The first count charges all of the defendants with conspiring to possess with intent to distribute, and to distribute, one kilogram or more of heroin, in violation of 21 U.S.C. § 846.  Defendants Miguel Lara and Gladys Lara are also charged in Count Two with possessing with intent to distribute 100 grams or more of heroin, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B) and 18 U.S.C. § 2.  The final count charges Miguel and Gladys Lara with possessing firearms in furtherance of the drug trafficking crimes charged in Counts One and Two, in violation of 18 U.S.C. §§ 924(c)(1) and 2.  (Docket # 39).

Before this Court for Report and Recommendation are motions by three of the defendants.  Miguel Lara moves to suppress a photographic identification made of him by a government witness and to suppress statements and evidence.  (Docket # 352).  Melvin Rivera moves to suppress telephone conversations intercepted by law enforcement pursuant to a court-authorized wiretap.  (Docket ## 259, 364).[1]  Finally, Jerrel Appleberry moves to suppress physical evidence seized from his residence on the date of his arrest.  (Docket # 185).[2]  The following constitutes this Court's Report and Recommendation as to each of the defendants' motions.

---

[1]  With the government's consent, Melvin Rivera has joined in the motion to suppress wiretap communications originally filed by co-defendant Jeanette Burgos.  (*See* Docket # 182).

[2]  Defendants' omnibus motions also sought, *inter alia*, severance, discovery and inspection, a bill of particulars, disclosure of *Brady* material, notice pursuant to Rule 12(d) of the Federal Rules of Criminal Procedure, rulings on evidentiary matters under Rules 404, 608 and 609 of the Federal Rules of Evidence, preservation of rough notes, an audibility hearing, disclosure of *Jencks* material, a *Wade* hearing and disclosure of informant information. (Docket ## 111, 187, 185, 259).  Each of these requests was either resolved by the parties or decided in open by the undersigned on March 8, April 7, or July 21, 2005.  (Docket ## 246, 270, 329, 330).

## FACTUAL BACKGROUND

### I.  Lara Suppression Hearing

On August 23, 2005, this Court conducted a hearing on Miguel Lara's motions to suppress a photographic identification, statements made at the time of his initial arrest on April 22, 2004, and statements made and evidence seized at the time of his subsequent arrest on October 6, 2004.  At the hearing, the government introduced the testimony of Special Agents Timothy A. Kernan and David Timothy Zon of the Drug Enforcement Administration (DEA) and New York State Police Investigator Charles Torres.

**A.  Photographic Identification:**  Special Agent Kernan testified that he participated in an investigation of narcotics trafficking by Miguel Lara and, in connection with that investigation, displayed a photographic array to a confidential informant.  (Tr.A 10-11; G.Ex. 1).[3]  Specifically, Kernan testified that he supervised a controlled purchase of heroin by the informant on September 24, 2003.  One to two hours after the purchase, Kernan and Special Agent James Jaskolka met with the informant at the Rochester DEA office.  (Tr.A 14, 26).  During the debriefing of the informant, Kernan presented him with the photographic array and advised him that although it was not necessary for him to recognize any of the individuals depicted, if he could identify anyone in the array, he should circle the number above the photograph, date it and place his initials on it.[4]  (Tr.A 14, 27).  Immediately thereafter, the informant identified the individual depicted in photograph number five as "Miguel."  (Tr. A 14-

---

[3]  The transcript of the hearing conducted on August 23, 2005 is hereinafter referenced as "Tr.A __". (Docket # 344).

[4]  For ease of reading, this Court will use the male pronoun to refer to the confidential informant, although the government has not identified the gender of the individual.

15).  Kernan then directed the informant to circle the number five and to write the name by which

he knew the individual.  The informant circled the number five, initialed it, wrote the name

"Miguel" on the photographic array and indicated that he was the person from whom the

informant had purchased heroin earlier that day.  (Tr.A 15; G.Ex. 1).  After the informant was

finished, Kernan dated and signed the photographic array and requested Jaskolka to sign the array

as a witness, which he did.  (Tr.A 16; G.Ex. 1).  Kernan further testified that neither he, nor

anyone else said anything to the informant that would have suggested which of the photographs

the informant should identify.  (Tr.A 16).

      **B.  <u>Statements Made on April 22, 2004</u>:**  Investigator Torres testified that on

April 22, 2004, he participated in the execution of a search warrant for the residence of Miguel

and Gladys Lara at 46 Portage Road.  (Tr. A 31).  After the S.W.A.T. team had entered and

secured the residence, Torres was informed that Miguel and Gladys Lara had been located in an

upstairs bedroom.  (Tr.A 31).  Torres then entered the house with Special Agent Jaskolka and

observed Miguel and Gladys Lara handcuffed in the bedroom.  (Tr.A 32).  Jaskolka asked the

Laras whether they understood English, and they indicated that they "knew a little bit."  (Tr.A

32).  Believing that they would be more comfortable speaking Spanish, Torres began to talk them

in the Spanish language.  (Tr.A 32).

      Torres advised the Laras that law enforcement agents were at their residence to

execute arrest warrants and a search warrant relating to drugs and weapons.  (Tr.A 33).

Following Torres's statement, Miguel Lara pointed to a bag on a dresser and said, "Well, that's

the only drugs that are here."  (Tr.A 33).  Torres then advised Miguel and Gladys Lara of their

*Miranda* rights by reading from a Spanish *Miranda* card.  (Tr.A 34-35, G.Ex. 2).  According to

Torres, the Spanish version of the *Miranda* warnings is identical to the English version.  (Tr.A 35).  As he read the rights, Torres paused after each line and asked Miguel Lara whether he understood.  Following the reading of the rights, Torres asked Miguel whether he understood his rights and whether he was willing to answer questions.  (Tr.A 36-37).  Miguel responded affirmatively to both questions.  (Tr.A 37).

Following the *Miranda* warnings, Torres spoke with Miguel for approximately five minutes.  During that time, Torres testified, Miguel was "very cooperative" and did not appear to be under the influence of drugs or alcohol.  (Tr.A 35-39).  Torres did not threaten Miguel in order to induce him to speak.  Nor at any time did Miguel indicate that he wanted to stop talking or to speak with an attorney.  (Tr.A 38).

**C.  Statements Made on October 6, 2004:**  Special Agent Zon testified that he supervised the execution of another search warrant for Miguel and Gladys Lara's residence on October 6, 2004.  At some point during the search, Zon entered the upstairs bedroom in which Miguel and Gladys Lara had been secured by Special Agent Jaskolka and two officers from the Rochester Police Department.  (Tr.A 46).  Miguel Lara was in bed handcuffed, wearing only a tee-shirt and his underwear.  (Tr.A 47).

Because Jaskolka was planning to arrest Miguel Lara, the officers attempted to find suitable clothing for him to wear, and one of them asked Miguel whether he had any pants.  Miguel appeared not to understand, prompting Zon to repeat the question in Spanish.  (Tr.A 47-48).  Miguel then responded in Spanish, "Yes" and pointed to the bedroom door.  (Tr.A 49).  Zon looked on the back of the door and discovered a pair of black pants.  (Tr.A 50).  Before providing the pants to Miguel, and following his customary practice, Zon searched the pockets to ensure

officer safety.  In the pockets of the pants, Zon found a wallet containing Miguel's driver's

license and an amount of heroin.  (Tr.A 50).  Following the discovery of heroin, Zon called for an

evidence custodian to seize the narcotics.  (Tr.A 51).  Miguel was then given the pants to wear

and transported to the Federal Building.  (Tr.A 51-52).


## II.  Appleberry Suppression Hearing

This Court also conducted a suppression hearing on Appleberry's motion to

suppress physical evidence seized from his residence.  During the hearing, the government

elicited testimony from Special Agent Mark Gentile of the Drug Enforcement Administration

("DEA").  The defense called David Lauer,[5] as well as the defendant Jerrel Appleberry.

**A.  Testimony of Special Agent Gentile:**  Special Agent Gentile testified that on

April 22, 2004, he assisted in the execution of an arrest warrant for Jerrel Appleberry at 52 Radio

Street.  (Tr.B 3).[6]  At approximately 6:00 a.m., Gentile, Special Agent Lauer and six additional

officers approached the residence.  Their weapons were not displayed as they approached the

front door.  Lauer knocked on the door, which was answered by Appleberry's father.  (Tr.B 4-5).

Lauer asked him whether Jerrel Appleberry was at home, and he responded that he was.  Lauer

then asked whether the officers could enter, explaining that they had a federal arrest warrant for

Jerrel.  Mr. Appleberry allowed the officers to enter and stated, "[H]e is upstairs in the back

bedroom."  (Tr.B 4).

---

[5]  Lauer did not specifically identify the law enforcement agency by which he was employed; a review of his testimony suggests that he, like Mark Gentile, was employed by DEA.

[6]  The transcript of the hearing conducted on March 28, 2005 is hereinafter referenced as "Tr.B __". (Docket # 286).

After receiving permission to enter, Gentile, Lauer and another agent entered the house and proceeded up the stairs. (Tr.B 5). At the top of the stairs, Gentile observed a long hallway with a closed door at the end. (Tr.B 5-6). The officers drew their weapons, and, assuming that the closed door led to the bedroom in which Appleberry was located, one of the officers announced, "Jerrel, we have an arrest warrant. Are you in the bedroom? Are you in the bedroom?" (Tr.B 6). About thirty seconds later, Appleberry emerged from the bedroom, wearing only a pair of shorts. (Tr.B 6, 8). Appleberry was ordered to lie down on the floor with his arms extended, which he did. (Tr.B 7). Lauer handcuffed Appleberry behind his back before continuing into the bedroom to perform a safety sweep to ensure that no one else was present. (Tr.B 7). Lauer thereafter announced that the room was clear and that there was "some stuff" on the nightstand. (Tr.B 11).

Once the room was secured, Appleberry was brought back into the bedroom so that he could dress. (Tr.B 8). When Gentile entered the room, he observed small plastic baggies, a box with a picture of a scale on it and various documents on the nightstand. (Tr.B 9, 29). While Appleberry was dressing, Gentile asked, "[D]o you mind if we have a look around? Can we search the room?" (Tr.B 10-11). Appleberry responded "fine" or "okay," and a search was then conducted. (Tr.B 10).

According to Gentile, Appleberry was cooperative throughout the encounter. (Tr.B 10). His answers to questions appeared responsive, and he did not appear to be intoxicated. (Tr.B 11). Neither Gentile, nor any other officer in Gentile's presence, physically or otherwise threatened Appleberry in order to obtain his consent for the search. (Tr.B 10-11).

B. **Testimony by Special Agent Lauer**:  Special Agent Lauer also testified concerning Appleberry's arrest on April 22, 2004.  (Tr.C 4-5).[7]  Lauer testified that at approximately 6:00 a.m., he, Special Agent Gentile and other unnamed law enforcement agents knocked on the door to the residence and announced their presence.  (Tr.C 6, 8).  Jerrel Appleberry's father, Mr. Appleberry, responded to the door.  (Tr.C 6).  Lauer explained to Mr. Appleberry that he had an arrest warrant for his son.  Mr. Appleberry indicated that Jerrel was asleep in an upstairs bedroom.  (Tr.C 8).  Lauer and Gentile then went upstairs where, at the top of the stairs, Lauer observed a long hallway.  Lauer shouted, "Jerrel, we're the police," to which Appleberry responded, "I'm in here."  (Tr.C 8-9).  Lauer ordered Appleberry to come out of the room with his hands up and to assume a prone position.  (Tr.C 9-10).  Appleberry complied, and Gentile searched him for weapons and secured him with handcuffs, while Lauer performed a security sweep of the bedroom from which Appleberry had emerged.  (Tr.C 10-11).  At the time, Lauer testified, Appleberry was wearing only boxer shorts.

As he exited the bedroom to return to the hallway, Lauer observed packaging materials on top of a dresser.  (Tr.C 11).[8]  Appleberry was then escorted back into the bedroom so that he could dress.  While in the bedroom, Gentile obtained Appleberry's consent to search the room.  (Tr.C 12).  Appleberry's verbal consent was witnessed by Lauer and Special Agent Ryan Glore, who had also entered the bedroom.  (Tr.C 13).  During the subsequent search, an electronic scale and a letter addressed to Appleberry were seized, along with the packaging

---

[7]  The transcript of the hearing conducted on May 9, 2005, is hereinafter referenced as "Tr.C __".  (Docket # 287).

[8]  An electronic scale was discovered on top of the dresser.  Lauer could not recall whether he observed the scale during the initial protective sweep of the bedroom or whether it was discovered during the subsequent search. (Tr.C 12-13).

8

materials observed earlier.  (Tr.C 12-13).  Lauer further testified that after obtaining Appleberry's

consent, he likely would have searched any closed containers located within the bedroom.  Lauer

did not specifically recall, however, whether he opened any such closed containers or whether he

opened the drawers to the dresser.  (Tr.C 16-17).

  **C.  <u>Testimony of Jerrel Appleberry</u>:**  Appleberry testified that on the morning

of April 22, 2004, he awoke to the sounds of shouting.  (Tr.C 19).  Appleberry specifically

recalled someone yelling, "Jerrel, don't do anything stupid.  This is the U.S. Marshals and DEA

agents.  Come out, open the door with your hands up."  (Tr.C 19).  Still groggy, Appleberry heard

his name shouted three times before he responded.  When he did respond, Appleberry yelled

through the door, "The door is locked, if you hear a click, don't think I'm doing anything stupid

and I got to turn on a light."  After apparently opening the door, one of the officers ordered

Appleberry to "turn around, put your hands behind your head and interlock your fingers behind

your head," which he did.  (Tr.C 19).

  Special Agent Lauer entered the room, handcuffed Appleberry, patted him down,

positioned him in the corner of the bedroom and asked, "Where is the drugs, preferably

cocaine?"  (Tr.C 20).  Appleberry responded that he did not have any drugs.  According to

Appleberry, one of the other officers then stated, "You don't look like no big drug dealer.  You

got nothing in this room."  (Tr.C 20).  Throughout the initial encounter, Appleberry testified, he

was wearing only boxer shorts and a white tank top.  (Tr.C 20).

  According to Appleberry, the plastic baggies with an apple marking that were

seized from the bedroom were obtained from inside a manila envelope that contained the

property of his deceased brother.  (Tr.C 21).  The bill addressed to Appleberry was inside another

legal envelope, which was itself inside a duffle bag located on the floor next to the bed.  (Tr.C

22).  The scale, Appleberry testified, was also inside the duffle bag and was removed by Agent

Lauer.  (Tr.C 23).

Appleberry further testified that when Lauer asked for permission to search the

bedroom, he denied consent because he was not the only person who lived in the room.

According to Appleberry, he has two foster brothers and a sister who also occasionally use the

bedroom.  (Tr.C 24).  For this reason, Appleberry explained, he declined to consent to the search.


## REPORT AND RECOMMENDATION

### I.  Motions By Miguel Lara

**A.  Suppression of Photographic Identification:**  Miguel Lara asserts that the

photographic identification of him made by the confidential informant should be suppressed on

the grounds that the identification procedure utilized was unduly suggestive.  An out-of-court

photographic identification will be suppressed under the Due Process Clause only if "the

photographic identification procedure was so impermissibly suggestive as to give rise to a very

substantial likelihood of irreparable misidentification."  *Simmons v. United States*, 390 U.S. 377,

384 (1968); *see also Stovall v. Denno*, 388 U.S. 293, 301-02 (1967).

In *Manson v. Brathwaite*, 432 U.S. 98 (1977), the Supreme Court reaffirmed that

a defendant has the right not to be subjected to an identification procedure that creates a "very

substantial likelihood of irreparable misidentification."  *Id.* at 116 (quoting *Simmons v. United

States*, 390 U.S. at 384).  In determining whether to exclude a pretrial identification, the court

must undertake a two-step analysis.  First, the court must consider whether the identification

procedure was unduly suggestive.  If so, the court then must determine whether the identification

nevertheless possessed "sufficient aspects of reliability."  *United States v. Bubar*, 567 F.2d 192,

197 (2d Cir.), *cert. denied*, 434 U.S. 872 (1977) (citing *Manson v. Brathwaite*, 432 U.S. at 109-

17).  "Even if the procedure was unnecessarily (or impermissibly) suggestive, therefore, a district

court may still admit the evidence 'if, when viewed in the totality of the circumstances, it

possesses sufficient indicia of reliability.'"  *United States v. Bautista*, 23 F.3d 726, 729-30 (2d

Cir.) (footnote omitted) (quoting *United States v. Simmons*, 923 F.2d 934, 950 (2d Cir.), *cert.

denied*, 500 U.S. 919 (1991)), *cert. denied*, 513 U.S. 862 (1994).

At the government's request, this Court conducted a bifurcated *Wade* hearing.[9]

To date, the government has only offered evidence relating to the issue of the suggestiveness of

the identification procedures utilized.  No continuation of the hearing is necessary, of course, if

the court finds the procedure was not unduly suggestive.  If, to the contrary, the court finds the

procedure was impermissibly suggestive, a continuation of the hearing is warranted to determine

whether the witness who made the identification had an independent basis upon which to do so.

According to the testimony presented by Special Agent Kernan, on September 24,

2003, a confidential informant conducted a controlled purchase of heroin from Lara.

Approximately one to two hours later, Kernan and Special Agent Jaskolka met with the

informant at the Rochester DEA office and presented him with a six-photograph array.  (Tr.A 14,

26-27, G.Ex. 1).  Kernan advised the informant that although it was not necessary for him to

recognize any of the individuals depicted, if he could identify anyone in the array, he should

---

[9]  A *Wade* hearing refers to a hearing held pursuant to *United States v. Wade*, 388 U.S. 218 (1967), to
determine whether an out-of-court identification resulted from an impermissibly suggestive procedure and, if so,
whether it is independently reliable.

circle the corresponding number, date it, and place his initials on the recognized photograph. (Tr.A 14, 27). After reviewing the array, the informant identified photograph number five as "Miguel." (Tr.A 14-15). Pursuant to Kernan's instructions, the informant then circled the number five, initialed it and wrote the name "Miguel" above the photograph of Miguel Lara. (Tr.A 15, G.Ex.1). The informant identified "Miguel" as the person from whom he had purchased heroin earlier in the day. (Tr.A 15). According to Kernan, neither he, nor anyone else said anything to the informant to suggest which of the photographs he should identify. (Tr.A 16).

The photographic array presented to the informant contained six photographs. Each photograph depicts a frontal image of a male's face, neck and part of his shoulders. All of the men appear to be of similar age and coloring, have similarly short-cut hair and lack facial hair. *See United States v. Maldonado-Rivera*, 922 F.2d 934, 974 (2d Cir. 1990) ("fairness of photograph array depends upon number of factors, including the size of the array, the manner of presentation by the officers, and the array's contents"), *cert. denied*, 501 U.S. 1233 (1991). *See also United States v. Thai*, 29 F.3d 785, 808 (2d Cir.) ("principal question is whether the picture of the accused, matching descriptions given by the witness, so stood out from all the other photographs as to 'suggest to an identifying witness that [that person] was more likely to be the culprit'") (quoting *Jarrett v. Headley*, 802 F.2d 34, 41 (2d Cir. 1986)), *cert. denied*, 513 U.S. 993 (1994); *United States v. Marrero*, 705 F.2d 652, 655 n.5 (2d Cir. 1983) (six photographs is an acceptable number for a photographic array); *United States v. Joseph*, 332 F. Supp. 2d 571, 582 (S.D.N.Y. 2004) (finding that photographic array was not unduly suggestive where array contained six photographs of individuals of similar ethnicity, age, hair style and facial hair).

12

On this record, I find that the photographic procedure used with the confidential informant was not impermissibly suggestive.  It is thus my recommendation that Lara's motion to suppress this identification be denied.

**B.  Suppression of Statements:**  Lara also moves to suppress statements made by him at the time of his initial arrest on April 22, 2004, and at the time of his subsequent arrest on October 6, 2004.  (Docket # 352).  He also moves to suppress the heroin seized from his pants at the time of his October 6, 2004 arrest.  The government opposes the motions, arguing that Lara's statements and the challenged heroin should be admissible at trial.  (Docket # 359).

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the United States Supreme Court held that the government may not use a defendant's statements that are the product of custodial interrogation unless it demonstrates that the defendant was first warned of his Fifth Amendment privilege against self-incrimination and then voluntarily waived that privilege.  As the Second Circuit has articulated,

> [c]ustodial interrogation exists when a law enforcement official questions an individual and that questioning was (1) conducted in custodial settings that have inherently coercive pressures that tend to undermine the individual's will to resist and to compel him to speak (the in custody requirement) and (2) when the inquiry is conducted by officers who are aware of the potentially incriminating nature of the disclosures sought (the investigative intent requirement).

*United States v. Rodriguez*, 356 F.3d 254, 258 (2d Cir. 2004) (citing *United States v. Morales*, 834 F.2d 35, 38 (2d Cir. 1987) (internal citations omitted)).

"'Interrogation,' as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself."  *Rhode Island v. Innis*, 446 U.S.

291, 300 (1980).  Interrogation includes direct questioning, as well as "any words or actions on

the part of the police (other than those normally attendant to arrest and custody) that the police

should know are reasonably likely to elicit an incriminating response from the suspect," *Rhode*

*Island v. Innis*, 446 U.S. at 301, or that would "produce psychological pressures that [would]

subject the individual to the 'will' of his examiner."  *United States v. Morales*, 834 F.2d at 38

(citations omitted).  *See also United States v. Montana*, 958 F.2d 516, 518 (2d Cir. 1992); *United*

*States v. Thomas*, 961 F. Supp. 43, 44-45 (W.D.N.Y. 1997).

Conversely, statements made by a defendant that are not elicited in response to

interrogation do not violate the Fifth Amendment.  *See Innis*, 446 U.S. at 299-300.  Specifically,

the Court has reasoned:

> Any statement given freely and voluntarily without any compelling
> influences is, of course, admissible in evidence.  The fundamental
> import of the privilege while an individual is in custody is not
> whether he is allowed to talk to the police without the benefit of
> warnings and counsel, but whether he can be interrogated. . . .
> Volunteered statements of any kind are not barred by the Fifth
> Amendment and their admissibility is not affected by our holding
> today.

*Miranda v. Arizona*, 384 U.S. at 478; *see also Innis*, 446 U.S. at 299-300;

*United States v. Vasta*, 649 F. Supp. 974, 987 (S.D.N.Y. 1986).  *See United States v. DeVincenzi*,

1996 WL 252673, *2 (N.D.N.Y. 1996) (government bears burden of proving that defendant

made statements spontaneously) (citing *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir.

1991) (it is the government's burden to demonstrate that defendant's statements were not

obtained in violation of *Miranda*) (citations omitted)).

**1. Statements Made By Lara on April 22, 2004:**  Investigator Torres testified that on April 22, 2004, he assisted in the execution of arrest warrants and a search warrant for Lara's residence.  (Tr.A 31).  Once the residence was secured, Torres entered and observed Miguel and Gladys Lara handcuffed in an upstairs bedroom.  (Tr.A 31-32).  Special Agent Jaskolka initially asked the Laras whether they understood English.  Because they responded that they only "knew a little bit," Torres began speaking to them in Spanish.  (Tr.A 32).

Torres thereafter advised the Laras that agents had entered their house to execute arrest warrants and a search warrant relating to drugs and weapons.  (Tr.A 33).  At that point, Miguel Lara pointed to a bag on a dresser and stated, "Well, that's the only drugs that are here." (Tr.A 33).  Following Miguel's statement, Torres advised the Laras of their *Miranda* rights by reading from a Spanish *Miranda* card.  (Tr.A 34-35).  After reading the rights, Torres asked Lara whether he understood his rights and whether he was willing to answer questions.  Lara responded affirmatively to both questions.  (Tr.A 37).  Torres thereafter spoke with Lara for approximately five minutes.  At no time did Lara indicate that he wanted to stop talking or to speak with an attorney.  (Tr.A 38).  Moreover, Torres testified, Lara did not appear to be under the influence of drugs or alcohol and was not threatened in order to induce him to speak.  (Tr.A 39).

On this record, I find that Lara's admission was not obtained in violation of the Fifth Amendment.  Rather than questioning him, Torres simply explained why law enforcement agents had entered his home; he did not subject him to "any words or actions" that Torres should have known were reasonably likely to elicit an incriminating response from Lara or that would

15

"produce psychological pressures that [would have] subject[ed] [Lara] to the 'will' of his examiner." *Morales*, 834 F.2d at 38.  To conclude otherwise would restrict the ability of law enforcement agents to inform an individual whose home they have entered, usually unexpectedly and often forcibly, of the reasons for their entry.  Such a result is neither constitutionally mandated, nor practically sound.

In *United States v. Wipf*, 397 F.3d 677 (8th Cir.), *cert. denied*, 126 S. Ct. 64 (2005), the Eighth Circuit denied a suppression motion on facts apposite to this case.  In *Wipf*, the defendant, a teacher, was being investigated for sexually abusing students and for violating federal child pornography laws.  Following the defendant's arrest, he was interviewed by two special agents with the Federal Bureau of Investigations (FBI).  As the interview began, the defendant asked one of the agents whether he would receive a lawyer.  The agent indicated that he would, but stated that he first wanted to advise the defendant of his *Miranda* rights and explain the charges pending against him.  The agent then told the defendant that he had been arrested for the possession of child pornography based upon a number of video tapes that had been seized from his home.  The defendant responded by stating either, "You got me" or "You caught me."  *Id.* at 681.

The Eighth Circuit affirmed the trial court's admission of the defendant's statement at trial, finding that the statement was not the product of custodial interrogation.  As the court reasoned, "an inculpatory statement is not considered the product of custodial interrogation merely because it is made after the suspect has been told of the charges against him." *Id.* at 685 (citations omitted).  *See also United States v. Conley*, 156 F.3d 78, 83 (1st Cir. 1998) ("law enforcement officer's mere description of the evidence and of potential charges

16

against a suspect, in direct response to the suspect's importuning, hardly can be classified as interrogatory") (citations omitted); *United States v. Crisco*, 725 F.2d 1228, 1232 (9th Cir.) (police officer's response to defendant's questions as to reason for arrest did not constitute custodial interrogation), *cert. denied*, 466 U.S. 977 (1984).

Lara's reliance upon the decision in *United States v. McDaniel*, 2003 WL 22025872 (S.D.N.Y. 2003), is misplaced. In that case, law enforcement officers executed a search warrant for the defendant's apartment and detained the defendant in the rear seat of a police car during the search. The defendant expressed concern to one of the officers about the search and the safety of his dog. The officer informed the defendant that the police were executing a search warrant and that there were "possibly drugs and guns in the apartment." *Id.* at *2. Without administering *Miranda* warnings, the officer then advised the defendant, "If there's something you want to tell me, I'm listening." *Id.* After a moment, the defendant admitted that there was a gun in the apartment under his mother's bed. *Id.*

The court granted the defendant's suppression motion, finding that the officer's statement, "If there's something you want to tell me, I'm listening," was "not a neutral response," but was reasonably likely to elicit an incriminating response. *Id.* at *6-7 (internal quotations omitted). In this case, by contrast, Investigator Torres merely advised Lara that a search warrant was being executed for his residence and that the warrant related to drugs and weapons. Nothing in Torres's statement suggested that a reply of any kind was expected or encouraged. Torres could not reasonably have expected that Lara would respond by identifying a bag on a dresser and admitting that it contained drugs. On the record before me, I find that Lara's statement was

spontaneous and not the product of custodial interrogation.  Accordingly, I recommend that

Lara's motion to suppress statements made at the time of his arrest on April 22, 2004, be denied.

**2.  Statements Made by Lara on October 6, 2004:**  Lara's statements

made at the time of his subsequent arrest on October 6, 2004, were in response to Special Agent

Zon's inquiry as to whether he had pants.  According to the testimony offered by Zon, he entered

the Lara residence after Miguel and Gladys Lara had been detained in an upstairs bedroom.

(Tr.A 46).  At the time, Miguel Lara was dressed only in his underwear and a tee-shirt.  (Tr.A

47).  Zon asked Lara in Spanish whether he had any pants, prompting Lara to respond

affirmatively and to identify a pair of pants hanging on the back of the bedroom door.  (Tr.A

47-50).  Zon retrieved the pants and in accordance with his customary practice, searched the

pockets to ensure the safety of himself and other officers.  As Zon explained, "[F]or officer

safety, I didn't want to give a pair of pants to a defendant that might have a razor blade or some

sort of weapon or a pocket pistol in there that could be used against us."  (Tr.A 50).  During the

search of the pants, Zon discovered Lara's wallet and a quantity of heroin.  (Tr.A 50).

Lara moves to suppress his statement and the evidence seized from the pants on

the grounds that he was not first advised of his *Miranda* rights.  Applying the authority cited

*supra*, Zon's question to Lara cannot be considered interrogation because it was not reasonably

likely to elicit an incriminating response.  Zon was merely attempting to facilitate Lara's dressing

before he was taken to court.  Zon did not direct Lara to select the pants hanging on the door, but

merely asked him whether he had pants; indeed, Lara could have avoided self-incrimination by

simply selecting another pair of pants.  Once Lara identified the particular pair of pants hanging

on the door as those he wanted to wear, however, Zon was entitled to search the pants before

18

providing them to Lara, as part of a search incident to Lara's arrest.  *See United States v. Robinson*, 414 U.S. 218, 225-26 (1973) (upon lawful arrest, officer may search person arrested for weapons or evidence of suspected crime); *United States v. Garcia*, 1996 WL 544233 *8 (S.D.N.Y. 1996) (pursuant to search incident to arrest, agents were permitted to remove defendant's wallet from pocket of pants hanging on chair before providing them to defendant to wear).

Moreover, Lara's motion to suppress the heroin may be denied for an independent reason.  Even if Lara had not identified the pants on the door, the narcotics located within the pockets inevitably would have been discovered in the course of the execution of the search warrant for Lara's residence.  *See United States v. Eng,* 971 F.2d 854, 861 (2d Cir. 1992) (doctrine of inevitable discovery requires court to determine "viewing affairs as they existed at the instant before the unlawful search, what would have happened had the unlawful search never occurred").  For these reasons, it is my recommendation that Lara's motion to suppress his statements and evidence seized on October 6, 2004 be denied.


## II.  <u>Motions By Melvin Rivera</u>

Melvin Rivera has joined the motions of former co-defendant Jeanette Burgos challenging the use of statements intercepted pursuant to a wiretap authorized by United States District Judge David G. Larimer.  (Docket # 364).  Rivera argues in a conclusory fashion that the wiretap authorization was unsupported by probable cause and that the government failed to exhaust other investigative techniques, failed to notify the court of surreptitious entry, failed to properly minimize, failed to timely file progress reports and failed to properly seal the intercepted

communications.  (Docket # 182 at ¶¶ 45-49, 63-86).  While wiretaps were authorized for three telephone numbers, Rivera's challenge is only to the wiretap authorization for 585-503-0942, a prepaid cellular telephone number used by Miguel Lara (the "Lara Cellular Telephone").[10] (Docket # 364).[11]

     **A. <u>Standing</u>:**  Under 18 U.S.C. § 2518(10)(a), "[a]ny aggrieved person . . . may move to suppress the contents of any wire or oral communication intercepted pursuant to this chapter."  *See United States v. Fury*, 554 F.2d 522, 526 (2d Cir.), *cert. denied*, 433 U.S. 910 (1977).  An "aggrieved person" is defined under § 2510(11) as "a person who was a party to any intercepted wire, oral or electronic communication or a person against whom the interception was directed."  *See United States v. Fury*, 554 F.2d at 526.  The record is unclear whether Rivera was intercepted over the Lara Cellular Telephone.  Because the government has not challenged Rivera's standing, however, this Court will assume that Rivera was intercepted over that telephone number and thus has standing to bring his motion.

     **B. <u>Probable Cause of the Wiretaps</u>:**  Rivera joins Burgos's motion challenging the probable cause for the wiretap.  Under Title 18 U.S.C. § 2518(3), prior to issuing an order for the interception of wire communications, a judge must determine that:

> [1] [t]here is probable cause to believe that a crime has been, is being, or is about to be committed; [2] probable cause to believe that communications about the crime will be obtained through the

---

[10]  In his letter identifying which of the co-defendants' motions he seeks to join, Rivera states that he moves to suppress communications intercepted over telephone numbers 585-503-0942 and 585-266-8074.  The first telephone number is the Lara Cellular Telephone; the second is apparently Rivera's telephone number, for which no wiretap authorization was obtained.  (*See* Docket # 1, ¶¶ 63, 126).

[11]  As an appendix to its response to the pretrial motions of various defendants in this matter, the government has provided this Court with copies of the wiretap orders and accompanying applications.  (Docket # 207).  That appendix is hereinafter referenced as "Appendix __".

> wiretap; [3] alternative means have been tried and failed or appear
> too dangerous or unlikely to succeed; and [4] probable cause that
> the premises to be wiretapped are being used for criminal purposes
> or are used or owned by the target of the wiretap.

*United States v. Wagner*, 989 F.2d 69, 71 (2d Cir. 1993).

The probable cause standard applicable to wiretaps is the same as that required for a traditional search warrant. *Id.* (citing *United States v. Rowell*, 903 F.2d 899, 901-02 (2d Cir. 1990); *Fury*, 554 F.2d at 530). As the Supreme Court held in *Illinois v. Gates*, probable cause must be determined by evaluating the "totality of the circumstances." 462 U.S. 213, 238 (1983). As a reviewing court, however, this Court must accord "substantial deference" to the issuing court's finding of probable cause. *United States v. Wagner*, 989 F.2d at 72 (citations omitted).

This Court has reviewed the application submitted by law enforcement for the wiretap authorization of the Lara Cellular Telephone, which was based upon an affidavit of DEA Special Agent Daniel Young. In his affidavit in support of the Lara Cellular Telephone wiretap, Young described meetings between a confidential informant and Miguel Lara at MG Liquor and Wines, during which the informant made controlled purchases of heroin from Lara. During the first meeting, Lara provided the informant with his cellular telephone number (a number different from the number for which wiretap authorization was sought) and instructed him to call that number in order to coordinate future narcotics sales. Following the informant's inability to reach Lara on that number, Lara provided the informant with a new cellular telephone number (585-503-0942, the Lara Cellular Telephone). Using that number, the informant contacted Lara on two subsequent occasions and made arrangements to purchase additional quantities of heroin. (Appendix at 117-28). Considering the totality of the evidence, as well as the deference that this

Court must accord the issuing court's finding of probable cause, I find that Young's affidavit offered in support of the wiretap application for the Lara Cellular Telephone demonstrated probable cause to believe that communications about narcotics trafficking would be intercepted over the requested wiretap.

No evidence has been presented, moreover, to suggest that the law enforcement officers participating in the wiretap interceptions did not rely in good faith on the validity of the wiretap warrant. *See United States v. Leon*, 468 U.S. 897 (1984); *see also United States v. Bellomo*, 954 F. Supp. 630, 638 (S.D.N.Y. 1997) (collecting cases applying *Leon's* good faith exception to evidence seized pursuant to an electronic wiretap warrant). Under *United States v. Leon*, a court will not suppress evidence obtained pursuant to a warrant issued without probable cause unless (1) the issuing magistrate was knowingly misled; (2) the issuing magistrate wholly abandoned his or her judicial role; (3) the application was so lacking in indicia of probable cause as to render reliance upon it unreasonable; or (4) the warrant was so facially deficient that reliance upon it is unreasonable. *United States v. Leon*, 468 U.S. at 923; *see also United States v. Moore*, 968 F.2d 216, 222 (2d Cir.), *cert. denied*, 506 U.S. 980 (1992). No proof has been offered to suggest that any of these four exceptions apply here.

**C. Utilization of Traditional Investigative Techniques:** Without referring specifically to Young's affidavit, Rivera asserts in conclusory fashion that "the government failed to provide the Court with a full and complete statement as to whether or not other investigative procedures have been tried and failed." (Docket # 182 at ¶ 45).[12] While Rivera is correct that Title 18 U.S.C. § 518(1)(c) requires that an application for a wiretap authorization contain "a full

---

[12] The argument is articulated by Burgos, and joined by Rivera.

and complete statement as to whether or not other investigative procedures have been tried and

failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous,"

*see*, *e.g.*, *United States v. Kahn*, 415 U.S. 143, 153 n.12 (1974) (18 U.S.C. § 518 "is simply

designed to assure that wiretapping is not resorted to in situations where traditional investigative

techniques would suffice to expose the crime"); *United States v. Pacheco*, 489 F.2d 554, 565 (5th

Cir.1974), *cert. denied*, 421 U.S. 909 (1975) (intent of 18 U.S.C. § 518(1)(c) is "not to foreclose

electronic surveillance until every other imaginable method of investigation has been

unsuccessfully attempted, but simply to inform the issuing judge of the difficulties involved in

the use of conventional techniques"); *United States v. Valdez*, 1991 WL 41590, at *2 (S.D.N.Y.)

(the "other investigative procedures" requirement was not intended to turn electronic surveillance

"into a tool of last resort"), *aff'd*, 952 F.2d 394 (2d Cir. 1991), his assertion that Young's

affidavit failed to satisfy this requirement is unfounded.

As a reviewing court, this Court's role is merely "'to decide if the facts set forth in

the application were minimally adequate to support the determination that was made.'" *United

States v. Torres*, 901 F.2d 205, 231 (2d Cir.) (quoting *United States v. Scibelli*, 549 F.2d 222, 226

(1st Cir.) (collecting cases), *cert. denied*, 431 U.S. 960 (1977)), *cert. denied*, 498 U.S. 906

(1990); *see also United States v. Miranda*, 1993 WL 410507, *2-3 (S.D.N.Y. 1993) (issuing

court's determination concerning sufficiency of normal investigative techniques is entitled to

"substantial deference").  In this case, Young's affidavit contained a section entitled "Alternative

Investigative Techniques," which sufficiently explained why the goals of the investigation were

unlikely to be achieved through the continued use of traditional investigative techniques, such as

the use of confidential informants and undercover agents, physical surveillance, pen registers,

grand jury investigations and search warrants.  (Appendix at 132-38).  Despite Rivera's claim to

the contrary, I find that Young's demonstration of the insufficiency of traditional investigative

techniques was adequate to warrant the authorization of the wiretap.

      **D.  <u>Surreptitious Entry</u>:**  Rivera also joins Burgos's motion that law

enforcement failed to comply with the order's requirement that the government notify the court

of any surreptitious and forcible entry into the target residence to activate or deactivate the

wiretaps.  (Docket # 182 at ¶¶ 63-66).  The government has represented that wiretap in this case

did not require physical entry into any private residence.  (Docket # 207 at 34).  Thus, Rivera's

motion should be denied.

      **E.  <u>Failure to Minimize</u>:**  Rivera further argues that the government failed to

satisfy its obligation to minimize pursuant to 18 U.S.C. § 2518(5).  (Docket # 182 at ¶¶ 68-73).

That section requires that every wiretap order "shall be conducted in such a way as to minimize

the interception of communications not otherwise subject to interception."  18 U.S.C. § 2518(5).

Moreover, as the Supreme Court has recognized:

> During the early stages of surveillance the agents may be forced to
> intercept all calls to establish categories of nonpertinent calls
> which will not be intercepted thereafter.  Interception of those same
> type of calls might be unreasonable later on, however, once the
> nonpertinent categories have been established and it is clear that
> this particular conversation is of that type.

*Scott v. United States*, 436 U.S. 128, 141 (1978).

      Here, Rivera joins Burgos's motion challenging the failure to minimize certain

calls between Burgos and Miguel Lara.  Rivera has not alleged that he was a participant in those

conversations; nor has he identified any conversations in which he was involved that he contends

24

were not properly minimized.  Accordingly, because Rivera's motion does not identify any conversations in which he participated that were not minimized, his motion should be denied. *See*, *e.g.*, *United States v. Estrada*, 1995 WL 577757, *7 (S.D.N.Y. 1995) (denying motion to suppress for failure to minimize because defendants did not identify any specific violations), *aff'd* 164 F.3d 620 (1998); *United States v. Clarke*, 1993 WL 478379 (S.D.N.Y. 1993) (denying minimization motion because defendants failed to offer any specific support); *United States v. McGuinness*, 764 F. Supp. 888, 900 (S.D.N.Y. 1991) (denying motion to suppress because defendant failed to identify particular calls that should have been minimized and were not).

**F.  Failure to Properly File Progress Reports and Seal Intercepted**

**Communications:**  Under 18 U.S.C. § 2518(6), a judge issuing a wiretap order may require that progress reports be prepared and submitted to the court as directed.  Similarly, 18 U.S.C. § 2518(8) requires that "[i]mmediately upon the expiration of the period of the order, . . . [recordings obtained pursuant to the wiretaps] shall be made available to the judge issuing such order and sealed under his directions."  Rivera moves to suppress the intercepted communications on the grounds that the government failed both to provide timely progress reports and to seal the recordings of the intercepted communications.  This Court's review of the record, however, demonstrates that the government has complied with the progress report and sealing requirements.

The wiretap authorization order for the Lara Cellular Telephone required the government to "provide the Court with a report on or about the tenth, twentieth and thirtieth days (or the next business day if either falls on a weekend or holiday) following the date of this Order showing what progress has been made toward achievement of the authorized objectives and the

need for continued interception." (Appendix at 148, 279). The authorization was signed on

February 9, 2004. (Appendix at 149). The first progress report was filed on February 18, 2004,

nine days after the authorization was signed. (Appendix at 347). The second progress report was

filed by the government on February 27, 2004, the eighteenth day following the Court's Order.

(Appendix at 353). The third progress report was filed on the thirtieth day, March 10, 2004.

(Appendix at 359). Also on March 10, 2004, the original compact disks containing the digital

recordings of calls intercepted during the time period from February 9, 2004 to March 9, 2004

were sealed pursuant to the order of Hon. Charles J. Siragusa, United States District Judge.

(Appendix at 414-16).

   Two days prior to the filing of the third progress report, on March 8, 2004, Judge

Siragusa authorized the continued wiretap of the Lara Cellular Telephone for an additional thirty

days. As in the initial authorization order, the continuation order required that progress reports

be filed on or about the tenth, twentieth, and thirtieth days. (Appendix at 204). The fourth

progress report was filed ten days later, on March 18, 2004. (Appendix at 360-65). The fifth

progress report was filed on March 30, 2004, the twenty-second day after the continuation order.

(Appendix at 366-72). The sixth and final progress report was filed on April 7, 2004, thirty days

after the issuance of the continuation order. (Appendix at 373-77). On that same day, the

compact disks containing the original recordings of calls intercepted during the period from

March 10 to April 6, 2004 were sealed by order of Judge Larimer. (Appendix at 421-23). Based

upon the above representations, I find that the progress reports were filed and the intercepted

communications were sealed in a timely manner. Accordingly, Rivera's motion to suppress

based upon the government's failure to file timely progress reports and to seal the intercepted communications should be denied.[13]

### III.   Motion by Jerrel Appleberry

The final motion before this Court is Jerrel Appleberry's motion to suppress physical evidence seized from his residence at the time of his arrest.  (Docket # 185).  Following the hearing, and for the reasons discussed below, this Court recommends denial of the motion.

The Fourth Amendment generally prohibits law enforcement officers from conducting a warrantless search of a defendant's residence.  *See* U.S. Const. amend. IV; *Maryland v. Dyson*, 527 U.S. 465, 466 (1999) (*per curiam*) (Fourth Amendment requires police officer to obtain a warrant before conducting a search, absent exigent circumstances or some other applicable exception) (citing *California v. Carney*, 471 U.S. 386, 390-91 (1985)).  An exception exists, however, to allow officers to perform a security sweep following a defendant's lawful arrest.  *See Maryland v. Buie*, 494 U.S. 325, 327 (1990).  "A 'protective sweep' is a quick and limited search of a premises incident to an arrest and conducted to protect the safety of police officers or others."  *Id.*  When performing such a sweep, officers are permitted to search "spaces immediately adjoining the place of [the defendant's] arrest from which an attack could be immediately launched."  *Id.* at 334.

---

[13]   Even had the government failed to file timely progress reports, "the sanction for failure to do so is surely not automatic suppression of the tapes."  *United States v. Scafidi*, 564 F.2d 633, 641 (2d Cir. 1977), *cert. denied*, 436 U.S. 903 (1978); *see United States v Benjamin*, 72 F. Supp. 2d 161, 190 (W.D.N.Y. 1999) (decision whether to continue wiretap authorization despite government's failure to file timely progress reports is within court's discretion).

Also excepted from the Fourth Amendment's warrant requirement are searches based upon the voluntary consent of a person authorized to provide consent. *Schneckloth v. Bustamonte,* 412 U.S. 218, 222 (1973); *United States v. Elliott*, 50 F.3d 180, 185 (2d Cir. 1995), *cert. denied*, 516 U.S. 1050 (1996). Such consent may be given either by the owner of the property that is to be searched, *Schneckloth v. Bustamonte*, 412 U.S. at 222, or by a third party possessing common authority over said property. *See United States v. Matlock*, 415 U.S. 164, 171 (1974). The consent need only be voluntary, that is, obtained without coercion, and the resident need not be advised of his or her right not to consent. *See Schneckloth*, 412 U.S. at 241-42; *United States v. Garcia*, 56 F.3d 418, 422 (2d Cir. 1995). "Consent must be a product of that individual's free and unconstrained choice, rather than a mere acquiescence in a show of authority." *United States v. Wilson*, 11 F.3d 346, 351 (2d Cir. 1993) (citations omitted), *cert. denied*, 511 U.S. 1130 (1994).

The government bears the burden of proving by a preponderance of the evidence that the consent was voluntary. *United States v. Buettner-Janusch*, 646 F.2d 759, 764, *cert. denied*, 454 U.S. 830 (1981). The issue of voluntariness is to be determined based upon the totality of the circumstances, *Schneckloth,* 412 U.S. at 227; *United States v. Hernandez*, 5 F.3d 628, 632 (2d Cir. 1993); *United States v. Kon Yu-Leung*, 910 F.2d 33, 41 (2d Cir. 1990), and the standard to be applied is an objective one, *United States v. Garcia*, 56 F.3d at 423.

In this matter, the credible testimony establishes that Special Agents Gentile and Lauer, along with other unidentified officers, executed an arrest warrant for Appleberry at 52 Radio Street. Appleberry's father permitted the agents to enter the residence to arrest Appleberry. After entering, the agents proceeded towards an upstairs bedroom in which

28

Appleberry was reportedly sleeping.  (Tr.B 3-4; Tr.C 6-8).  As they approached the closed

bedroom door, Lauer called out to Appleberry and ordered him to exit the room with his hands

raised.  (Tr.B 6; Tr.C 9).  Appleberry thereafter emerged from the room wearing only boxer

shorts and was handcuffed in the hallway.  (Tr.B 7; Tr.C 9-10).

Once Appleberry was secured, Lauer entered Appleberry's bedroom and

performed a security sweep to ensure that the room was empty.  (Tr.B 7; Tr.C 10-11).  During the

sweep, Lauer observed small plastic baggies on a table next to the bed.  (Tr.B 9; Tr.C 11).

Gentile then returned Appleberry to the bedroom so that he could dress.  (Tr.B 10; Tr.C 12).

When he was in the bedroom, Gentile also observed the plastic baggies next to the bed, as well as

other potential evidence.  (Tr.B 9-10).  In Lauer's presence, Gentile asked Appleberry if they

could search the room, and Appleberry agreed.  (Tr.B 10-11; Tr.C 13).  During the ensuing

search, the agents seized an electronic scale, a letter addressed to Appleberry and the plastic

baggies.  (Tr.C 12-13).  Appleberry was responsive to the agents' inquiries and did not appear to

be intoxicated during the encounter.  (Tr.B 11).  Finally, the agents neither threatened

Appleberry, nor used physical force in order to obtain his consent for the search.  (Tr.B 10-11).

On this record, I find that the evidence obtained from Appleberry's bedroom was

properly seized.  Initially, the agents were admitted into the house by Appleberry's father in order

to execute a valid arrest warrant.  Following Appleberry's arrest in the upstairs hallway, Lauer

was justified in entering the room from which Appleberry had emerged, and would be returned to

dress, in order to perform a protective sweep. *See Maryland v. Buie*, 494 U.S. at 334 (arresting

officer permitted to search spaces immediately adjoining place of defendant's arrest).  While in

the room, Lauer observed at least some of the seized evidence in plain view.  Pursuant to the

plain view doctrine, an agent is permitted to seize items of evidentiary value if he has a legitimate right to be in the location, the item's incriminating nature is obvious and the officer can lawfully access the object.  *See Horton v. California*, 496 U.S. 128, 136-37 (1990); *Illinois v. Andreas*, 463 U.S. 765, 771 (1983).

It is not entirely clear from the testimony whether all of the evidence that was seized was initially observed in plain view or whether, as Appleberry contends, some of the evidence was stored in a duffle bag next to the bed.  (Tr.C 22).  That question need not be resolved, however, because Appleberry consented to a search of his room, pursuant to which, Lauer testified, he would have searched any closed containers located in the bedroom.

The totality of the circumstances demonstrates that Appleberry's consent to search was provided to Gentile voluntarily and without coercion, and was witnessed by Lauer.  (Tr.B 10; Tr.C 13).  *See Schneckloth*, 412 U.S. at 241-42.  That his consent was given verbally, rather than in writing, does not invalidate his otherwise voluntary consent.  *See*, *e.g.*, *United States v. Garcia*, 339 F.3d 116, 120 (2d Cir. 2003) (upholding search of apartment predicated upon verbal consent); *United States v. DeBenedictis*, 1991 WL 79398, *1-3 (S.D.N.Y. 1991) (finding search justified based upon initial verbal consent despite defendant's subsequent refusal to sign written consent form following discovery of evidence).  Moreover, both Gentile and Lauer testified that they did not have a written consent form with them at the time of Appleberry's arrest (Tr.B 22; Tr.C 14), and that they believed such a form was unnecessary because more than one officer had witnessed the verbal consent.  (Tr.B 22, Tr.C 13-14).

Accordingly, the physical evidence obtained from Appleberry's bedroom was lawfully seized pursuant either to the plain view doctrine, or Appleberry's voluntary consent to

search, or a combination of the two exceptions.  This Court thus recommends denial of Appleberry's motion to suppress the evidence seized at the time of his arrest.


## **CONCLUSION**

For the foregoing reasons, it is my recommendation that Miguel Lara's motions to suppress the photographic identification of him, his statements and the evidence seized from his pants **(Docket # 352)** be **DENIED**.  It is also my recommendation that Melvin Rivera's motion to suppress wiretap communications **(Docket ## 259, 364)** be **DENIED**.  Finally, it is my recommendation that Jerrel Appleberry's motion to suppress physical evidence seized at the time of his arrest **(Docket # 185)** be **DENIED**.


_s/Marian W. Payson_
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
November _23_, 2005.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 58.2(a)(3) of the Local Rules of Criminal Procedure for the Western District of New York.[14]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See, e.g., Paterson-Leitch Co., Inc. v. Massachusetts Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 58.2(a)(3) of the Local Rules of Criminal Procedure for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 58.2(a)(3) may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**

                         *s/Marian W. Payson*
                            MARIAN W. PAYSON
                          United States Magistrate Judge

Dated: Rochester, New York
        November _23_, 2005.

---

[14] Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(F) commences with the filing of this Report and Recommendation. Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the ten days allowed for filing objections has elapsed. *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).